J-A23026-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INT. OF: J.H.P., III A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.H.P., JR., NATURAL | : | |
| FATHER AND C.A.P., NATURAL | : | |
| MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 827 MDA 2022 |

Appeal from the Order Entered May 2, 2022
In the Court of Common Pleas of Huntingdon County Orphans' Court at
No(s): CP-31-OC-16-2021

BEFORE: BOWES, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                    **FILED: DECEMBER 20, 2022**

J.H.P., Jr. ("Father") and C.A.P. ("Mother"), collectively "Parents," appeal from the May 2, 2022 order granting the petition filed by Huntington County Children's Services ("CYS") to involuntarily terminate their parental rights to their son, J.H.P., III ("J.H.P.").[1]  We affirm.

In February 2020, J.H.P. was born to Mother and Father, who have mild intellectual disabilities and mental health problems associated with psychological trauma.  The family was referred for family preservation services due to J.H.P.'s failure to thrive and the inability of Mother and Father to satisfy

---

[*] Former Justice specially assigned to the Superior Court.

[1] As the orphans' court identified the child as J.H.P. in its thorough opinion and order terminating the parental rights of Mother and Father, we refer to the child in the identical manner herein.

his basic needs. Despite this assistance, the situation continued to deteriorate and on April 13, 2020, J.H.P. was hospitalized with a diagnosis of failure to thrive as he had not gained weight in the past month. CYS obtained emergency protective custody of J.H.P. when he was approximately two months old. He was immediately placed in his current foster home, a pre-adoptive resource, where he remains.

On April 29, 2020, the juvenile court adjudicated J.H.P. dependent. CYS provided Parents reunification services through a program administered by Raystown Developmental Services ("RDS"). Parents were also provided supervised in-person visitations and video visitations when necessary to limit exposure to Covid-19. The supervised visitations were initially scheduled in two three-hour periods per week, but based upon CYS recommendations, in February 2021, the court reduced the duration of the visits to one and one-half hours per session. Despite receiving services through RDS, Parents failed to remedy the parenting deficiencies that led to CYS intervention. They still struggled to perform basic childcare tasks independently. The caseworkers noted Parents' difficulty in properly changing J.H.P.'s diaper, preparing meals, recognizing safety hazards, and providing the child meaningful supervision.

On July 28, 2021, CYS filed petitions to terminate the respective parental rights of Mother and Father pursuant to 23 Pa.C.S. § 2511(a)(5) and (8). The Court appointed counsel for Parents. J.H.P. was represented by

Robert M. Covell, Esquire, who acted as the child's guardian *ad litem* in the dependency proceedings.[2]

At the outset of the ensuing evidentiary hearing, the orphans' court incorporated the record of the dependency proceedings into the adoption docket. Thereafter, CYS presented the expert testimony of Sarah Jefferson, the licensed clinical social worker who performed the bonding assessment and filed a concomitant report in 2020. CYS also presented the testimony of Christi Shawley, the CYS caseworker assigned to work with the family, Piper Tanner, who was the family service manager at RDS, and Heather Fisher, the RDS reunification caseworker who supervised Parents' visitation with J.H.P. Parents testified and introduced a collection of emails as an exhibit. Following the submission of post-hearing briefs, the orphans' court entered a single decree terminating the respective parental rights of Mother and Father pursuant to 23 Pa.C.S. § 2511(a)(5), (8) and (b). This timely appeal followed. As Parents and the orphans' court both complied with Pa.R.A.P. 1925, the matter is ripe for our review.

Parents present the following issues for our review:

---

[2] Pursuant to *In re Adoption of K.M.G.*, 240 A.3d 1218 (Pa. 2020), we note that the orphans' court determined that there was no conflict in Attorney Covell's dual role as counsel and guardian *ad litem* because J.H.P.'s age prevented him from stating a preferred outcome. *See* N.T., 12/14/21, at 1-2. *See also In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018) (If a child is "too young to be able to express a preference as to the outcome of the proceedings," there is no conflict between legal and best interests.).

     I.    Whether the evidence was insufficient to sustain a termination of the natural parents' parental rights to J.H.P., III under 23 Pa.C.S. § 2511(a)(5) in light of the specific allegation that was contained within the petition to terminate parental rights in that the conditions which led to the child's removal or placement no longer existed as only those issues raised in a pleading may be tried?

     II.    Whether the evidence was insufficient to sustain a termination of the natural parents' parental rights to J.H.P., III under 23 Pa.C.S. § 2511(a)(8) in light of the specific allegation that was contained within the petition to terminate parental rights in that the conditions which led to the child's removal or placement no longer existed since only those issues raised in a pleading may be tried?

     III.    Whether the evidence was insufficient to sustain a termination of the natural parents' parental rights to J.H.P., III under both 23 Pa.C.S. § 2511(a)(5) and 23 Pa.C.S. § 2511(a)(8) since the child's needs and welfare will not be best met by the proposed termination of natural Parents' parental rights and pursuant to 23 Pa.C.S. § 2511(b) upon proper consideration of the developmental, physical and emotional needs and welfare of the child?

Parents' brief at 4 (cleaned up).[3]

We review these issues mindful of our well-settled standard of review. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if

---

[3] We note with disapproval that Attorney Covell neglected to file a brief with this Court on J.H.P.'s behalf.

- 4 -

they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

As our High Court stated, "an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, *supra*, at 1123-24.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *C.M.*, *supra*, at 358. Termination of parental rights has "significant and permanent consequences for both the parent and child." *L.A.K.*, *supra*, at 591. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear,

direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***C.M.***, ***supra***, at 359 (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." ***C.M.***, ***supra***, at 359; ***see also*** 23 Pa.C.S. § 2511(a)(1)-(11). In evaluating whether the petitioner proved grounds under §2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." ***Interest of L.W.***, 267 A.3d 517, 524 n.6 (Pa.Super. 2021). If the trial court determines the petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, the court then must assess the petition under § 2511(b), which focuses on the child's needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

Instantly, we analyze the orphans' court's decisions pursuant to § 2511(a)(8) and (b) of the Adoption Act:[4]

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from

---

[4] This Court need only agree with any one subsection of § 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

- 6 -

the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

To satisfy § 2511(a)(8), the petitioner must show three components: (1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. *In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa.Super. 2018).

The crux of the instant appeal concerns the second component of § 2511(a)(8), *i.e.*, whether the conditions which led to removal continue to exist. Unlike other subsections, § 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children. *In re M.A.B.*, 166 A.3d 434, 446 (Pa.Super. 2017). "[T]he relevant inquiry" regarding the second prong of § 2511(a)(8)

"is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Further, the Adoption Act prohibits the court from considering, as part of the § 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

Arguing their first two issues collectively, Parents initially assert that we must reverse the termination of their parental rights because the orphans' court considered evidence that exceeded the allegations set forth in CYS's petitions to terminate the parental rights of Mother and Father, respectively. *See* Parents' brief at 12, 14. Parents posit, "Based upon the status of the pleadings and the failure to conform the filings to the evidence that was presented in Court, the Order which terminated [Parents'] rights as to [J.H.P.] must be reversed. *Id*. at 12.

Relatedly, Parents contend that the record does not support the termination decrees because Parents remedied the only reasons given in CYS's petitions for the involuntary termination of parental rights. *Id*. at 16-17. Quoting select portions of CYS's termination petitions, Parents attempt to restrict the grounds for termination to the noted concerns that "the child was exhibiting signs of failure to thrive" and "that the natural parents were not feeding the child as needed." *Id*. At 16, 17. Next, Parents reason that since

the evidence established that J.H.P. is **currently** healthy and developing normally, and that Parents demonstrated the ability to feed J.H.P. ready-made meals during the supervised visitations, the conditions that CYS pled necessitated removal no longer exist. *Id*. At 18-20.

In rejecting the contentions that Parents asserted relative to the sufficiency of CYS's petitions, the orphans' court reasoned, "if natural Parents do attempt to argue that . . . CYS went outside of the scope of the issues raised in its petitions, the allegations set forth therein are broad enough to encompass all issues and evidence raised at the termination of parental rights hearing[.]" Rule 1925(a) Opinion, 6/7/22, at 2. For the following reasons, we agree with the orphans' court's finding that the petitions were sufficiently specific.

At the outset, we observe that Parents read the averments in CYS's termination petitions too narrowly. While Parents' brief quotes portions of a single paragraph in framing its argument concerning the allegedly insufficient facts pled therein, the petitions pled pertinent facts in at least four other enumerated paragraphs. Including the specific paragraph that Parents invoke in their brief, the petitions included four sets of allegations that related to Parents collectively and one set that referred to Mother and Father's individual parental deficiencies.

The pertinent averments that appear in both petitions asserted the following:

7.     [J.H.P.] has been in placement since April 16, 2020, based upon the [emergency protective custody o]rder entered by this Honorable Court.  **This Order was entered because the child was exhibiting signs of a failure to thrive**, and had been admitted to Penn State Health Milton S. Hershey Medical Center for treatment.  **The concern was that the natural parents were not feeding the child as needed**.

          . . . .

9.     The Agency believes and therefore avers that **[Parents] failed to make adequate progress in caring for [J.H.P.] and lack the parenting skill to parent [their] child**.

          . . . .

11.    **At the time [J.H.P.] was removed from his parents' care, both parents demonstrated an inability to provide proper parenting for the child**.  To the best of the Agency's knowledge, the parents have not remedied these concerns and it appears unlikely that they will remedy these issues within a reasonable period of time.

          . . . .

Count II
23 Pa.C.S. § 2511(a)(8)

          . . . .

23.    The conditions which led to the removal and placement of the child, **namely the [parent's] general inability to provide parental care to the child**, continue to exist.

CYS Petition to Terminate Parental Rights, 7/28/21, at unnumbered 1-3 (emphases added).

Next, the respective petitions outlined each parent's specific weaknesses.  As to Father, CYS averred,

8.     The natural father has made no progress toward alleviating the circumstances which necessitated placement.  An attachment assessment, conducted by Sarah Jefferson, LCSW, in December

- 10 -

2020, indicated both **cognitive impairment and severe attachment disruption** for the natural father. It was observed during this assessment that the **natural father lacked the ability to understand and meet the needs of his child, and that it was not safe or appropriate for [J.H.P.] to return full time to the care of his biological parents**. Subsequent observations made during supervised visitations through Raystown Developmental Services **confirmed to the Agency the concerns regarding the natural father's ability to care for his child**[.]

Petition to Terminate Father's Parental Rights, 7/28/21, at unnumbered 3 (emphases added).

Likewise, the CYS petition delineated Mother's parenting defects as follows:

8.    The natural mother has made no progress toward alleviating the circumstances which necessitated placement. During supervised visitation[,] . . . reunification workers observed that **the natural mother required multiple prompts during visitations, does not retain the parenting knowledge and skills provided to her, and is not able to apply that information in visits with her child**. An attachment assessment conducted by Sarah Jefferson, LCSW, in December 2020, indicated **both cognitive impairment and severe attachment disruption for the natural mother**. It was observed during this assessment that the **natural mother lacked the ability to understand and meet the needs of their child, and that it was not safe or appropriate for [J.H.P.] to return full time to the care of his biological parents**.

Petition to Terminate Mother's Parental Rights, 7/28/21, at unnumbered 3 (emphases added).

Thus, contrary to Parents' protestations, CYS leveled detailed allegations of fact that were far broader than what Parents suggested by focusing solely upon the isolated references to J.H.P.'s failure to thrive and

Parents' inability to feed the child properly. *See* Parents' brief at 16-18. Plainly, the agency set forth the precise grounds for termination under § 2511(a)(8). Indeed, Paragraph 23 of the CYS petition explicitly sets forth the element of § 2511(a)(8) that Parents place at issue and mischaracterize in their brief. *See* CYS Petition to Terminate Parental Rights, 7/28/21, at unnumbered 3. Thus, rather than limiting the predicate condition to J.H.P's failure to thrive or Parents' inability to prepare food, the CYS petitions averred that "[t]he conditions which led to the removal and placement of the child [were Parents'] general inability to provide parental care to the child[.]" *Id*. Moreover, as underscored by the foregoing highlighted averments, in addition to noting Parents' role in the child's failure to thrive, CYS made specific allegations of facts concerning Parents' general inability to provide parental care, lack of parenting skills, and slow progress in rectifying that deficiency. *See* CYS Petition to Terminate Parental Rights, 7/28/21, at ¶¶ 9,11, 23.

Furthermore, the agency unambiguously pled that Father's cognitive impairment and mental health problems affected his ability to comprehend and satisfy his son's needs insofar as it was unsafe for J.H.P. to return to Father's full time care. *See* Petition to Terminate Father's Parental Rights, 7/28/21, at ¶ 8. Similarly, CYS explicitly averred that Mother does not retain instruction and failed to demonstrate parental skills during the supervised visitations despite multiple prompts. *See* Petition to Terminate Mother's Parental Rights, 7/28/21, at ¶ 8. As with Father, the agency pled that Mother

suffers from cognitive impairments, has mental health problems, and lacks the ability to understand and meet the needs of her son. *Id*. Again, it asserted that "it was not safe or appropriate for [J.H.P.] to return full time to the care of his biological parents." *Id*.

As outlined above, the respective petitions to terminate parental rights clearly alleged facts sufficient to form the foundational framework to bear the relevant evidence that the agency subsequently presented during the hearing. Accordingly, we reject Parents' threshold argument that the trial court terminated parental rights on facts that were not properly pled.

Next, to the extent that Parents challenge the sufficiency of the evidence that CYS presented during the hearing, that claim also fails. Retaining their narrow perspective of the relevant inquiry as the child's failure to thrive, Parents assert that the trial court disregarded testimony that J.H.P. is currently healthy and that Parents feed J.H.P. during the supervised visitations. *See* Parents' brief at 18-20. Parents contend that this evidence "conclusively demonstrates" that the conditions which led to J.H.P.'s placement no longer exist. *Id*. at 20.

First, Parents' reliance upon the child's current progress patently ignores the essential role of the foster parents in J.H.P.'s continued development since his placement in their care in April 2020. Similarly, while Parents' basic achievements under the supervision of service providers are encouraging, they are not representative of Parents' ability to care for the child

independently. Hence, notwithstanding Parents' protestations to the contrary, we reject the contentions that these facts "conclusively demonstrate" that the conditions which led to placement, *i.e.*, Parents' inability to provide parental care, no longer exist.

More importantly, the force of Parents' argument goes to the weight of the evidence as opposed to whether CYS presented sufficient evidence to establish each element of the statutory grounds to terminate the parental rights of Mother and Father pursuant to § 2511(a)(8). Insofar as the certified record supports the orphans' court's finding that the parental deficiencies that gave rise to this case continue to exist, we cannot substitute our judgment for that of the orphans' court. ***See In the Interest of D.F.***, 165 A.3d 960, 966 (Pa.Super. 2017) ("The [o]rphans' [c]ourt is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence.").

Instantly, the certified record sustains the determination of the orphans' court. In terminating the parental rights of Mother and Father, the orphans' court made the following pertinent findings of facts, which it characterized in its opinion and order as "Troubling issues raised by Ms. Fisher's testimony[,]"

> a. Despite receiving services since just after J.H.P.'s birth, and then in-person for eighteen months, Parents still struggle to change J.H.P.'s diaper properly. . . . As of the [Termination of Parental Rights] Hearing, Parents still struggled to clean J.H.P adequately, but more troublingly, struggled to complete diaper changes independently (*i.e.*, either Mother or Father acting alone, as opposed to helping each other). [N.T., 12/14/21,] at 57.

- 14 -

b.    Feeding was a concern early on, as evidenced by J.H.P.'s failure to thrive, but continues to be a concern, as the meals that Parents prepare for J.H.P. during their visits are very basic.  *Id*. at 51, 55-56; *id*. at 115 (. . . usually . . . a sausage, egg, and cheese bagel or a muffin and a hash brown).

c.    Parents have a very poor understanding of safety issues and risks for J.H.P., including how quickly he can get hurt, and neither recognize risks quickly nor remember to address them consistently when they are identified for Parents and the proper resolution is modeled repeatedly.  *Id*. at 55. (Parents had to repeatedly be directed not to heat bottles in the microwave, to the point that Ms. Fisher had to stop the microwave mid-heating to drive home the point emphatically), 58-59 (as Mother was bathing J.H.P. in the kitchen sink, she failed to identify that the coffee maker sitting on the counter next to the sink, plugged in and containing a full pot of fresh, hot coffee, was a serious risk for J.H.P.[)]

       . . . .

d.    Parents generally have a poor understanding of child development, how quickly young children change and engage in new behaviors, and the need to interact with J.H.P. regularly and engage in activities to bond with him.  *Id*. at 51, 54-55, 61-62, 65-66, 67. They tend to do okay if prompted, but if left alone, revert to allowing other activities (such as reading on a smartphone) to distract them while J.H.P. is left on his own without meaningful supervision or interaction. *Id*.

e.    Parents struggle to perform even basic childcare tasks independently. . . .

Orphans' Court Opinion, 5/2/22, at 5.

After listing several other findings of fact relating to Ms. Jefferson's expert testimony concerning Parents' cognitive issues and mental health problems, the court returned to Ms. Fisher's testimony and surmised, "Simply put, **it is clear that they cannot adequately care for J.H.P. and provide**

**for his physical and emotional needs without daily, intensive**

**supervision and guidance**." *Id*. at 13 (emphasis added).

Thereafter, under the heading "Analysis," the orphans' court reasoned,

> In the instant case, the facts and testimony establish, beyond a reasonable doubt, that **the conditions that gave rise to the Dependency Case continue to exist and cannot be remedied by Parents**.  Where the record establishes that a parent is not capable of providing their child with a safe and healthy environment in which to live due to an inherent incapacity, and there is no evidence in the record that the fact of such incapacity could change, termination is warranted regardless of the parent's sincerely stated desire to raise their child and lack of responsibility for causing such incapacity.  Despite the tragic nature of such situations, "sympathies to the plight of the parent cannot cloud the consideration of whether parental termination meets the needs and welfare of the child."

*Id*. at 16 (quoting **B.L.W.**, 843 A.2d 380, 387 (Pa.Super. 2004) (*en banc*) (cleaned up)).

As the certified record supports the orphans' court's finding that Parents have not remedied the predicate parenting deficiencies despite the best efforts of CYS and its service providers, we reject Parents' argument that CYS adduced insufficient evidence to prove that the conditions which led to J.H.P.'s placement continue to exist.  Hence, we discern no basis to upset the orphans' court's conclusion that CYS established by clear and convincing evidence the statutory basis to terminate the parental rights of Mother and Father pursuant to § 2511(a)(8).

Having found that the certified record supports the orphans' court's determination pursuant to § 2511(a), we address Parents' arguments relating

to § 2511(b), which requires the orphans' court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." *T.S.M.*, *supra*, at 628 (citation and quotation marks omitted). Our Supreme Court has made clear that § 2511(b) requires the trial court to consider the nature and status of the bond between a parent and child. *In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993). It is reasonable to infer that no bond exists when there is no evidence suggesting the existence of one. *See In re K.Z.S.*, 946 A.2d 753, 762–63 (Pa.Super. 2008). To the extent there is a bond, the trial court must examine whether termination of parental rights will destroy a "necessary and beneficial relationship," thereby causing a child to suffer "extreme emotional consequences." *E.M.*, *supra*, at 484-85.

"While a parent's emotional bond with his or her child is a major aspect of the [s]ubsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re M.M.*, 106 A.3d 114, 118 (Pa.Super. 2014). "In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id*. In determining the needs and welfare, the court may properly

consider the effect of the parent's conduct upon the child and consider "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights." **L.W.**, **supra**, at 524.

Furthermore, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **T.S.M.**, **supra**, at 268.  The Court directed that, in weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." **Id**. at 269.  The **T.S.M.** Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly.  When courts fail . . . the result, all too often, is catastrophically maladjusted children." **Id**.

Instantly, based upon the evidence adduced at the termination hearing, including Ms. Jefferson's expert testimony and Ms. Fisher's observations during supervised visitations, the orphans' court found that, even though Parents clearly love their son, no meaningful parent-child bond existed with J.H.P.  Instead, the court determined that J.H.P. maintains a strong familial bond with his pre-adoptive foster parents who have cared for him since April 2020.  Hence, the court concluded that "[t]ermination of parental rights in this case will therefore not destroy the existing, necessary, and beneficial relationship for J.H.P. (which is with his foster parents), but rather will

strengthen and support it." Orphans' Court Opinion, 5/2/22, at 18-19 (cleaned up).

In assailing the orphans' court's best-interest analysis, Parents first invoke aspects of the dependency record, which was expressly incorporated into the record during the evidentiary hearing. Parents assert that CYS is judicially estopped from denying the existence of a parent-child bond in the instant case because the permanency plans that CYS fashioned for J.H.P.'s dependency proceedings and filed in the juvenile court during May 14, and October 14, 2020 previously noted "strong" and "good" parent-child bonds, respectively. *See* Parents' brief at 25. Characterizing these statements as judicial admissions, Parents posit that the orphans' court now "must find [CYS] was bound by their judicial admissions . . . including that there is a very close attachment and extremely strong bond, which existed and continued to exist between [Parents] and [J.H.P.]" *Id*. at 28.

Parents' argument is more daring than convincing. Assuming, *arguendo*, that the statements in J.H.P's juvenile court permanency plans from 2020 constitute pleadings, stipulations, or testimony that are tantamount to a judicial admission, and by no means are we suggesting that they are, judicial estoppel would not preclude CYS from asserting the absence of a meaningful

parent-child bond when the termination hearing occurred in December 2021.[5] At most, CYS would be barred from refuting that a "strong" or "good" parent-child bond existed in May and October 2020. Tellingly, however, CYS makes no such assertion as to the state of the parent-child bond during those periods.

To the extent that Parents make this identical claim in regard to the isolated reference in Ms. Jefferson's 2020 bonding assessment to J.H.P.'s "not inconsequential" relationship with Parents, this claim also misses the mark. It is critical to note that while Parents interpret the phrase "not inconsequential" to mean significant or substantial, Ms. Jefferson's use of the terminology was considerably less positive. In fact, the reference appears in the bonding assessment as part of Ms. Jefferson's conclusion **in favor of adoption** and specifically describes "the loss that is inherent in not being raised by biological family." N.T., 12/14/21, Exhibit D at 6. During cross-examination, Ms. Jefferson further explained that all children have an innate relationship with their biological parents and that it eventually will be important for J.H.P. to understand that his biological parents existed. N.T., 12/14/21, at 29-31. Thus, insofar as Ms. Jefferson's reference did not describe a meaningful parent-child bond, CYS still would not be barred from contesting its existence. Accordingly, Parents' novel judicial estoppel claim fails.

---

[5] Additionally, Parents fail to explain how their suggested application of judicial estoppel would enhance the 2020 characterization of a "strong" or "good" bond to the "extremely strong bond" that they currently assert continues to exist. *See* Parents' brief at 28.

Their alternative argument is more conventional. Essentially, Parents contend that CYS did not satisfy its burden of proving that terminating parental rights served J.H.P.'s developmental, physical, and emotional needs and welfare. The focus of this assertion is that Ms. Jefferson's 2020 report did not address the effect that severing the parent-child bond would have on J.H.P. *Id*. at 30. Further, Parents contend that the orphans' court neglected to consider the "intangible dimensions" of the needs and welfare analysis. Mother and Father argue that they are capable of formulating a healthy bond with their son and assert that "the record is replete with references that [they] very much love and care for their minor child[.]" *Id*. at 33.

The certified record both belies Parents' assertions of error and sustains the orphans' court's determination that termination best serves J.H.P.'s developmental, physical, and emotional needs and welfare. First, contrary to Parents' contentions that they can maintain a safe and beneficial bond with J.H.P., the foregoing discussion of the evidence demonstrates that Parents' substantial parenting deficiencies continue to present a significant risk to J.H.P.'s safety and physical wellbeing. *See* N.T., 12/14/21, 19. Ms. Jefferson agreed that L.H.P. would face a "grave risk of injury" if he was left unsupervised with Parents. *Id*.

Indeed, in contrast to Parents' characterization of the record, Ms. Jefferson clearly opined that she could not envision a healthy parent-child bond ever developing between Parents and J.H.P. *Id*. at 21. In relation to Mother,

Ms. Jefferson simply opined that "the attachment deficit is extremely severe and great." *Id*. At 21. As to Father, Ms. Jefferson explained that Father lacked "the cognitive capacity to [learn] to keep him safe." *Id*. at 20. She continued, "even though there is that genuine feeling of attachment [with J.H.P.,] it is not strong enough or healthy enough to keep him safe." *Id*. The orphans' court did not err or abuse its discretion in considering the effect of Parents' conduct upon J.H.P.'s safety and wellbeing. *See L.W.*, *supra*, at 524 (noting aptness of considering "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights").

Parents accurately observe that Ms. Jefferson's assessment focused upon the deficient nature of the parent-child relationship rather than specifically confronting the effect of severing that relationship. However, Ms. Jefferson explained that her discussion was, in fact, relevant to the ultimate determination before the court. *Id*. at 32. She reasoned that where, as here, attachment wounding and disruption exist, it takes several years of intense therapy to ameliorate it. *Id*. at 32. Accordingly, notwithstanding the lack of a specific discussion regarding severance, there "is a serious concern for [Parents'] ability to develop [a] healthy and safe attachment with [L.J.P.]." *Id*. at 33. Phrased differently, this case does not present a necessary and beneficial relationship between Parents and J.H.P. that would cause harm to J.H.P. if severed.

Furthermore, notwithstanding Parents' reliance upon Ms. Jefferson's acknowledgement of their relationship with J.H.P. in the 2020 bonding assessment, Ms. Jefferson's testimony described J.H.P.'s positive bond with the foster family, with whom he has lived for all but two months of his life. *Id*. at 95-96, 21-22. She recounted her assessment of the child's bond with his foster family as follows:

> [I]n stark contrast to what I observed when [J.H.P]. was with his biological parents[,] . . . [he] was bright and vocalizing. They were making faces, there was touch. He was being held. I mean, he was absolutely vibrant and appearing . . . without distress, [and] . . . of normal development. It was warm and natural and I had absolutely no concerns. You could see it in an instant.

*Id*. at 21-22. Ms. Jefferson expounded on the significance of this observation by highlighting that the interactions with the foster family exhibited the foundational hallmarks of attachment, *i.e.*, "[i]f I reach out for help, is someone going to respond, and [J.H.P.'s] behavior indicated his clear confidence of that." *Id*. at 22 (cleaned up).

The testimony of Ms. Shawley, the CYS caseworker assigned to the family, similarly confirmed that J.H.P.'s primary bond is with his foster parents, one of whom he refers to as "mom-mom." *Id* at 103. She described a loving relationship in a vibrant environment where J.H.P. is "very interactive with the family." *Id*. at 102-03.

Hence, the fact that Ms. Jefferson previously noted Parents' relationship with J.H.P. in 2020 does not negate the testimony regarding the significant parent-child bond that the child maintains with his foster family, which the

court concluded was "the existing, necessary, and beneficial relationship" that should be supported. Orphans' Court Opinion, 5/2/22, at 18-19.

In sum, the testimony presented at the evidentiary hearing demonstrated that the only beneficial and necessary parent-child bond in this case exists between J.H.P. and his foster parents, rather than between him and Parents, and that J.H.P continues to thrive in his foster home. Thus, the certified record supports the orphans' court's finding that the termination of parental rights will serve the child's developmental, emotional, and physical needs and welfare. *Id*. at 18-19. In contrast to Parents' arguments concerning the significance of "intangible dimensions," including **their** love for J.H.P., the focus of the § 2511(b) analysis remains upon J.H.P. and the effect upon **him** of severing a beneficial existing parent-child bond. *See* Parents' brief at 30. In this vein, we observe that considerations relating to J.H.P.'s relationship with the foster parents are crucial components of the court's § 2511(b) analysis. *See In re A.S.*, 11 A.3d 473, 483 (Pa.Super. 2010) ("[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent."). Accordingly, we discern no abuse of discretion in the orphans' court's needs and welfare analysis.

For all of the foregoing reasons, we affirm the orphans' court order terminating the parental rights of Mother and Father pursuant to § 2511(a)(8) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/20/2022